Jane Sylvia BARRETT

v.

Mark H. BARRETT, alias, et al.

No. 2004–232–Appeal.

Supreme Court of Rhode Island.

March 23, 2006.

Mark A. Sjoberg, Esq., Warwick, for Plaintiff.

Nicholas Gorham, Esq., North Scituate, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

Was the illusory transfer test set forth by this Court in *Pezza v. Pezza*, 690 A.2d 345 (R.I.1997), legislatively repealed by the enactment of G.L.1956 § 33–25–2(b), as enacted by P.L.1999, ch. 444, § 1?[1] The plaintiff, Jane Sylvia Barrett (Jane or plaintiff), contends that at the time of his death, her late husband, Horace M. Barrett (Horace or decedent), owned in fee simple certain real property on Prudence Island in Portsmouth. In accordance with § 33–25–2(a), Jane further contends that she was entitled to a life estate in the Prudence Island property upon Horace's death. According to Jane, despite Horace's conveyance of the property during his lifetime to a revocable trust, her statutory right to a life estate in the property survived because the conveyance was an illusory transfer under this Court's holding in *Pezza*.

In the alternative, notwithstanding the conveyance, Jane argues that Horace retained the rights incidental to ownership in fee simple such that her interest in the life estate was not defeated. She maintains that these issues should be remanded for a trial. Conversely, defendants, Mark H.

---

1. Because both subsections (a) and (b) of G.L. 1956 § 33–25–2 will be discussed throughout this opinion, we provide them here for reference purposes:

   "**Life estate to spouse.**—(a) Whenever any person shall die leaving a husband or wife surviving, the real estate owned by the decedent in fee simple at his or her death shall descend and pass to the husband or wife for his or her natural life subject, however, to any encumbrances existing at death; provided that the liability, if any, of the decedent to discharge the encumbrance or encumbrances shall not be impaired. The provisions of §§ 33–1–1 and 33–1–2 shall be subject to the provisions of this chapter and of § 33–1–6.

   "(b) For purposes of this section, any real estate conveyed by the decedent prior to his or her death, with or without monetary consideration, shall not be subject to the life estate granted in subsection (a) if the instrument or instruments evidencing such conveyance were recorded in the records of land evidence in the city or town where the real estate is located prior to the death of the decedent. Nothing in this section shall be construed to require that the instrument or instruments evidencing the conveyance must be recorded prior to the death of the decedent to be valid and thus not subject to the life estate contained herein."

Barrett and Karen B. Monahan, Horace's children and co-trustees of the "Horace M. Barrett Trust of February 22, 2000" (co-trustees), argue that § 33–25–2(b) abolished the illusory transfer test and thus, the hearing justice properly granted summary judgment. For the reasons that follow, we affirm the summary judgment granted in favor of defendants.

## Facts and Travel

The decedent and his first wife, Nancy Halloran Barrett (Nancy), were married for fifty-two years when, in 1997, Nancy died. They had five children: Mark H. Barrett, Marilyn Whitney, Karen Monahan, Cathi Goulet and H. Mitchell Barrett. In 1976, Horace and Nancy purchased a single-family home on Prudence Island (Prudence Island property).[2]

In 1998, Horace married Jane Sylvia Barrett[3] and on January 13, 1999, he executed his last will and testament. He bequeathed to Jane: (1) certain personal property; (2) a monetary bequest that varied in size depending upon the length of the marriage at the time of Horace's death; and (3) a proportional share in the residue of his estate. Also included in the will was the following statement addressing any perceived deficiencies in the bequests to his second wife:

"The relatively small size of the bequest does not reflect my lack of regard or affection for [Jane] but rather my prior obligation to the children and grandchildren of my first wife, Nancy Halloran

Barrett, as I still feel that fifty percent of my estate is hers."

Shortly thereafter, by revocable trust agreement between himself as donor and his children, Mark H. Barrett and Karen B. Monahan, as cotrustees, Horace created the "Horace M. Barrett Trust of February 22, 2000" (trust). By quitclaim deed, Horace conveyed the Prudence Island property to the trustees, reserving for himself a life estate with "[the] full power to sell, mortgage, convey or otherwise encumber the life estate and the remainder[.]" The trust agreement also provided that upon Horace's death, "[t]he Trustee shall give to the persons administering [Horace's] estate such amounts as pursuant to [Horace's] will may be requested by such persons to satisfy any monetary bequest contained in [Horace's will] in favor of [Horace's] wife, Jane Sylvia Barrett." Thereafter, Horace's children and Jane would share equally in 40 percent of the remaining trust estate[4] and Horace's grandchildren would receive 60 percent of the remaining amount.

On March 20, 2000, less than a month after executing the trust agreement, Horace amended its terms; he excluded Jane as a trust beneficiary and granted the trustees the option to retain the Prudence Island property for the general use of the beneficiaries, in lieu of liquidating it upon his death. However, the provision securing payment of Jane's monetary bequest remained unaffected.

Horace died on January 24, 2003. His estate was probated in the Town of Ports-

---

2. Two years later, they expanded their property by purchasing an adjoining parcel, as well. Both parcels collectively comprise the real estate in which Jane is seeking a life estate.

3. At the time of their marriage, Horace was seventy-four years old and Jane was forty-one years old.

4. Jane could share in the residue of the trust estate only so long as she and Horace were married for at least five years and if she was alive at the time of Horace's death—a milestone that was not reached. However, this provision later was rendered moot when Horace amended the trust agreement to exclude Jane as a beneficiary.

mouth and his son, Mark H. Barrett, was appointed executor. Dissatisfied with the bequests made to her under Horace's will, Jane waived and renounced the bequests in accordance with § 33–25–4 [5] and exercised her statutory right to a life estate in the property allegedly owned by Horace in fee simple at the time of his death. Jane brought suit against the trustees in Superior Court seeking a declaration of her rights in the Prudence Island property and an injunction against any alienation, encumbrance or waste by the trustees until her rights and interest were determined by the Court.

According to Jane, Horace's conveyance to the trust was illusory and was aimed at defeating her statutory right to a life estate. The trustees responded that Jane had no rights in the property because Horace did not own it in fee simple at the time of his death and further, that the application of § 33–25–2(b) effectively overruled the illusory transfer test set forth in *Pezza.*

The trustees moved for judgment on the pleadings that was ultimately treated as a motion for summary judgment pursuant to Rule 56 of the Superior Court Rules of Civil Procedure. On April 20, 2004, the hearing justice issued a written decision granting summary judgment in favor of the trustees. Relying on § 33–25–2(b), the hearing justice found that Horace effectively divested himself of fee simple ownership of the Prudence Island proper-

ty before he died, thus defeating Jane's statutory rights as a surviving spouse.[6] Jane appeals this decision.

## Standard of Review

■■■■ This Court reviews a decision granting summary judgment *de novo. United Lending Corp. v. City of Providence,* 827 A.2d 626, 631 (R.I.2003). When performing this review, our task is to examine the admissible evidence in a light most favorable to the nonmoving party to determine whether the evidence establishes a genuine issue of material fact. *Carlson v. Town of Smithfield,* 723 A.2d 1129, 1131 (R.I.1999). Once the party seeking summary judgment has alleged the absence of any disputed issues of material fact, the opposing party, to avoid summary judgment, must come forward with proof sufficient to establish the existence of a specific, material, triable fact. *Providence Journal Co. v. Convention Center Authority,* 774 A.2d 40, 46 (R.I. 2001) (citing *Bourg v. Bristol Boat Co.,* 705 A.2d 969, 971 (R.I.1998)).

## Analysis

We first must discern the intended effect of § 33–25–2(b) to determine whether it was intended to supplant the illusory transfer test announced in *Pezza.* The illusory transfer test and § 33–25–2(b) contain conflicting criteria about what is required to defeat a surviving spouse's

5. Section 33–25–4 provides:

"**Election by surviving spouse—Recording of waiver and claim.**—If any estate, real or personal, be devised or bequeathed to a surviving spouse, the devise or bequest shall bar the life estate unless the surviving spouse shall, within six (6) months after the date of the first publication of the qualifications of the fiduciary of the estate of the deceased spouse, file in the probate court granting probate a written statement waiving and renouncing the devise and bequest and claiming

his or her life estate in the real estate of the decedent. If any of this real estate be located in any city or town other than that in which the will of the decedent is probated, the waiver and claim shall also be filed in the records of deeds in each city and town where the real estate is located."

6. The hearing justice did not address whether § 33–25–2(b) supplanted the illusory transfer test.

statutory right to a life estate in the decedent's real property. If these inconsistencies cannot be reconciled, the more recent legislative pronouncement, § 33–25–2(b), will trump the earlier judicially crafted illusory transfer test. This would not be the first time the General Assembly enacted legislation in response to a judicial pronouncement.

For instance, the General Assembly's enactment of the Public Employee Pension Revocation and Reduction Act, G.L.1956 chapter 10.1 of title 36 supplanted this Court's holding in *In re Almeida*, 611 A.2d 1375, 1388–89 (R.I.1992), in which we declared that honorable service was a necessary prerequisite for vesting of pension rights. *See Smith v. Retirement Board of the Employees' Retirement System of Rhode Island,* 656 A.2d 186, 190 (R.I.1995).

On another occasion, after this Court abolished the common-law distinctions between the duty of care a landowner owes to licensees, invitees, and trespassers and substituted the tort test of reasonableness, in *Mariorenzi v. Joseph DiPonte, Inc.,* 114 R.I. 294, 307, 333 A.2d 127, 133 (1975), the General Assembly enacted G.L.1956 chapter 6 of title 32, entitled "Public Use of Private Lands—Liability Limitations," in an effort to resurrect the common-law immunity of landowners as to trespassers. *See Tantimonico v. Allendale Mutual Insurance Co.,* 637 A.2d 1056, 1060–61 (R.I. 1994).

Further, the codification of an exclusionary rule in this state, G.L.1956 § 9–19–25, that prohibits the introduction of illegally seized evidence, came as a legislative response to this Court's split decision in *State v. Olynik,* 83 R.I. 31, 39, 113 A.2d 123, 127 (1955), in which a majority of the Court declined to adopt an exclusionary rule as a matter of state constitutional law under article 1, section 6, of the Rhode Island Constitution. *See State v. Musu-*

*meci,* 717 A.2d 56, 75 n. 17 (R.I.1998) (Goldberg, J., concurring in part and dissenting in part).

On many occasions, the General Assembly codifies rules of law developed through judicial opinion. One such instance involved the abrogation of the interspousal immunity. At common law, a husband and wife were prohibited from bringing suit against each other for tortious injuries. However, this doctrine was strictly limited by judicial opinion. In 1978, we concluded "that actions sounding in tort by one spouse against [the other], at least as to claims arising out of motor vehicle collisions, should *no* longer be barred." *Digby v. Digby,* 120 R.I. 299, 305, 388 A.2d 1, 4 (1978). Soon thereafter, we decided that the interspousal immunity no longer was available in a tort action in which one or both spouses were dead. *Asplin v. Amica Mut. Ins. Co.,* 121 R.I. 51, 54, 394 A.2d 1353, 1355 (1978). Eventually, in 1987, the General Assembly "explicitly and totally abrogated" the common law doctrine of interspousal immunity. G.L.1956 § 15–4–17.

■ As we shall explain herein, it is the opinion of this Court that the General Assembly intended for § 33–25–2(b) to supplant the illusory transfer test, as set forth in *Pezza,* and that Jane's right to a life estate was extinguished when the Prudence Island property was conveyed and the conveyance was recorded in the Portsmouth land evidence records. Consequently, all other issues raised in this appeal become moot.

## 1. Background

In addressing the intended effect of § 33–25–2(b), it is helpful to examine the legislative history and this Court's pronouncements concerning dower and curtesy. "[A]t common law, dower [was] the

life interest [that] a wife acquir[ed] upon her husband's death in one-third of all the real estate of which he may have been seized or possessed at any time during their marriage." *Dickson v. Industrial National Bank of Rhode Island,* 115 R.I. 458, 460, 348 A.2d 26, 27 (1975). Similarly, curtesy was the husband's life interest in his deceased wife's real property. *See Probate Court of Providence v. New York Casualty Co.,* 63 R.I. 328, 331, 8 A.2d 867, 868 (1939).

On April 17, 1978, the General Assembly abolished the common law and statutory right to dower and curtesy and enacted §§ 33–25–1 through 33–25–6 in its stead. P.L.1978, ch. 26, § 1. These provisions vest a surviving spouse with important protections and a clear choice. He or she has the option of waiving any devise or bequest made by the decedent in favor of a life estate in all the real property that the spouse owned in fee simple at the time of his or her death. *See* §§ 33–25–2 and 33–25–4; *see, e.g., In re Estate of Gervais,* 770 A.2d 877 (R.I.2001) (a surviving spouse who renounced bequests to her from her deceased husband in favor of a statutory right to a life estate in his real property did not abandon the life estate by leasing the property).

On February 26, 1997, this Court, in *Pezza* was confronted with the question of a fraudulent or illusory transfer intended to defeat a surviving spouse's statutory share. In *Pezza,* the surviving spouse alleged that her husband's *inter vivos* transfer of real property to a trust was a fraudulent attempt on his part to deprive her of her rights under § 33–25–2. *Pezza,* 690 A.2d at 347. Despite our conclusion that the husband's transfer of his property to a trust before his death was sufficient to defeat his wife's statutory share, we adopted the illusory transfer test. The Court explained the test as follows:

"In order for a transfer of real property to a trust to be real, valid, and nonillusory, the spouse transferring the property must effectuate a completed inter vivos transfer by conveyance that both divests him or her of all ownership in the property and that, also, at the time of conveyance is made with the proper donative intent." *Id.* at 349.

Thus, in order for a surviving spouse's statutory share to be defeated by an *inter vivos* conveyance to a trust, the illusory transfer test, under *Pezza,* requires two elements: (1) a complete *inter vivos* transfer by conveyance that divests the spouse of all ownership in the property conveyed to the trust; and (2) proper donative intent to make an *inter vivos* gift or transfer of the real property. *Id.* Unless both elements are satisfied, the surviving spouse's right to a life estate in accordance with § 33–25–2(a) is not defeated.

In 1999, after our decision in *Pezza,* the General Assembly amended § 33–25–2 (P.L.1999, ch. 444, § 1) by adding subsection (b). Section 33–25–2(b) provides in relevant part:

"[A]ny real estate conveyed by the decedent prior to his or her death, with or without monetary consideration, shall not be subject to the life estate granted in subsection (a) if the instrument or instruments evidencing such conveyance were recorded in the records of land evidence in the city or town where the real estate is located prior to the death of the decedent."

Although we cannot discern from the language of § 33–25–2(b) whether the amendment was in response to our decision in *Pezza,* the enactment clearly conflicts with *Pezza's* holding, is proximate in time, and is in stark contrast to the judicially crafted illusory transfer test. Pursuant to § 33–25–2(b), the focus no longer is on the elements of complete divestiture

and proper donative intent. Instead, the statute provides that a spousal life estate can be defeated in two steps a conveyance of real estate prior to death and subsequent recording in the land evidence records. In light of the enactment's marked departure from our holding in *Pezza*, further analysis is useful.

## 2. The Intended Effect of G.L.1956 § 33–25–2(b)

We begin by noting that by its clear and explicit language, § 33–25–2(b) runs counter to the historical purposes that underlie dower and curtesy and the legislative purpose for which § 33–25–2(a) and other statutory spousal protections were enacted. However, "[i]n matters of statutory interpretation [the Supreme Court's] ultimate goal is to give effect to the purpose of the act as intended by the Legislature." *Webster v. Perrotta*, 774 A.2d 68, 75 (R.I.2001). "This is particularly true where the Legislature has not defined or qualified the words used within the statute." *D'Amico v. Johnston Partners*, 866 A.2d 1222, 1224 (R.I.2005) (quoting *Markham v. Allstate Insurance Co.*, 116 R.I. 152, 156, 352 A.2d 651, 654 (1976)).

When confronted with statutory provisions that are unclear or ambiguous, the Supreme Court, as the final arbiter, examines the statute in its entirety to glean the intent and purpose of the enactment from examining the entire statute, bearing in mind the " 'nature, object, and arrangement' of the provisions to be construed." *In re Advisory to the Governor*, 668 A.2d 1246, 1248 (R.I.1996). "[C]ourt[s] [are] not at liberty, merely because [there is] a choice between two constructions, to substitute for the will of the [L]egislature its own ideas of justice, expediency, or policy of the law." *Blais v. Franklin*, 31 R.I. 95, 106, 77 A. 172, 177 (1910).

The thrust of plaintiff's argument on this issue is that the illusory transfer test set forth in *Pezza* and the subsequent enactment of § 33–25–2(b) were meant to coexist. According to plaintiff, " § 33–25–2(b) was enacted to clarify the holding in *Pezza*, to address the concerns of the title bar and to facilitate trustee conveyancing of real estate." The plaintiff contends that our adoption of the illusory transfer test in *Pezza* led to "consternation among the title bar," because title attorneys, examiners and insurers were left to wonder whether to accept and insure deeds conveying property to trustees based solely upon an examination of the land evidence records. According to plaintiff, the concern was whether a title examiner must look to the circumstances behind a recorded transaction. The plaintiff submits that "[i]n enacting * * * § 33–25–2(b), the General Assembly resolved those concerns by reliance solely upon the recorded instrument." The plaintiff contends that by its enactment of subsection (b), the General Assembly intended that title examiners and insurers need not concern themselves with extraneous matters once they uncover a recorded deed.

We cannot accept this argument. The plaintiff contends on the one hand that § 33–25–2(b) was enacted for the purpose of easing the title bar's concerns about the illusory transfer test, but also argues that the illusory transfer test is still good law. If so, then issues surrounding a surviving spouse's statutory share and the donative intent of the settlor are not eliminated simply because the instrument was recorded. A recorded instrument bears little relevance to the issue of a complete divestiture of all ownership interest in the property and proper donative intent. *See Pezza*, 690 A.2d at 349–50.

We are of the opinion that § 33–25–2(b) and the illusory transfer test are incompa-

tible. The illusory transfer test was adopted in the absence of any legislative determination respecting *inter vivos* trusts of real property or whether a transfer to a trust is sufficient to defeat a surviving spouse's right to a life estate. By its enactment of § 33–25–2(b), the General Assembly has spoken in the clearest of terms, and has declared that the only predicate to defeating a surviving spouse's right to a life estate is a conveyance of the real estate that is recorded prior to death.[7]

■ As a general principle of statutory construction, we presume the General Assembly knows the state of the law when enacting new legislation. *See Shelter Harbor Fire District v. Vacca,* 835 A.2d 446, 449 (R.I.2003) (when the General Assembly expanded Shelter Harbor's act of incorporation in 1991, it was charged with the knowledge that this amendment would result in an expansion of property eligible for tax-exempt status under a previous amendment); *Romano v. Duke,* 111 R.I. 459, 462, 304 A.2d 47, 49 (1973) ("We presume that the Legislature is familiar with the construction we have given the phrase 'personal expenses' in suits brought under the earlier versions of our wrongful death statute."). Consequently, we proceed with the presumption that the General Assembly had full knowledge of *Pezza's* illusory transfer test when it enacted § 33–25–2(b). Therefore, given the clear, precise, and broad language of the amendment, we are of the opinion that the General Assembly intended to repeal the illusory transfer test when it enacted § 33–25–2(b).

■ Any ambiguity in the statute arises only because of its striking and seemingly unexplained departure from the traditional spousal protections as embodied in § 33–25–2(a) and the principles espoused in *Pezza.* However, it is not this Court's place "to substitute for the will of the Legislature [our] own ideas as to justice, expediency, or policy of the law." *Blais,* 31 R.I. at 106, 77 A. at 177. Moreover, "it is not the Supreme Court's function to rewrite or amend statutes that the General Assembly enacted." *Furia v. Furia,* 638 A.2d 548, 552 (R.I.1994).

■ We recognize that the term "conveyance" is not defined in § 33–25–2(b). However, it is well settled that " 'the words of a statute will be given their usual meaning.' " *Esposito v. O'Hair,* 886 A.2d 1197, 1199 (R.I.2005). The term "conveyance" is defined as, "[t]he voluntary transfer of a right or of property." Black's Law Dictionary 357 (8th ed.2004). The General Assembly did not delimit the type of conveyance necessary to avoid a spousal life estate or even require a complete divestiture of all beneficial interest in the real estate; instead, the broadest language was utilized: "any real estate conveyed by the decedent prior to his or her death." Section 33–25–2(b). The plaintiff urges us to qualify the term by incorporating the principles set forth in the illusory transfer test. We decline to do so.

If the General Assembly intended to limit the type of conveyance necessary to defeat a surviving spouse's life estate it could have done so. Further, like many other jurisdictions, the General Assembly

---

**7.** We recognize that § 33–25–2(b) is internally inconsistent. Although § 33–25–2(b) provides that property conveyed prior to death is not subject to a life estate if the "instrument or instruments evidencing such conveyance were recorded in the records of land evidence," it also provides that, "[n]othing in this section shall be construed to require that the instru-

ment or instruments evidencing the conveyance must be recorded prior to the death of the decedent to be valid and thus not subject to the life estate contained herein." Although this inconsistency is obvious, contradictory and troublesome, it is of no moment to the issues before the Court and shall be left for another day.

could have adopted the Uniform Probate Code's (UPC) augmented estate approach [8] that essentially provides a safeguard to the surviving spouse against the decedent's sham transfers. The augmented estate approach recaptures the value of certain nonprobate transfers and reincorporates that value into the decedent's estate. Its focus is on transfers in which the decedent retained certain incidents of ownership, power and control over the property after the conveyance and until the time of death. By contrast, the statute at issue here contains no such explicit qualifications or even a requirement of adequate consideration for the conveyance. We decline to infer them.

In this case, Horace conveyed the property to the trustees, reserving to himself a life estate with considerable powers to be exercisable until his death. The conveyance ultimately was recorded in the Portsmouth land evidence records. In light of the statute's broad language of § 33–25–2(b), we conclude that such a conveyance was sufficient to defeat Jane's right to a spousal life estate. Although Horace retained the power to "sell, mortgage, con-vey or otherwise encumber the life estate and the remainder," he did not do so. Thus, for purposes of § 33–25–2(a) and (b), the conveyance to the trust and recording in the land evidence records was complete and final.

Lastly, although not crucial to the outcome of this appeal, it is apparent from the record that Horace intended for the Prudence Island property to remain in the hands of his children from his first marriage to Nancy. The facts of this case do not suggest ill motivation or deceitful conduct by anyone, including Horace, to exclude Jane from sharing in his estate. Rather, the record shows a man honoring his first wife and the mother of his children and, at the same time, caring for his second wife to the best of his ability. Despite transferring the Prudence Island property to the trust, it is apparent that Horace intended to provide for Jane with other bequests. The trust instrument provided that upon distribution, the trust proceeds would first be utilized to satisfy the monetary bequest made to Jane under Horace's will. There is nothing in this record that persuades us that Horace act-

---

8. There have been a few permutations of the UPC augmented estate approach. For reference purposes, however, we provide the pre–1990 version which many states adopted and which provides the framework for the most current version.

"**Section 2–202 [Augmented Estate]—**

"The augmented estate means the estate reduced by funeral and administration expenses, homestead allowance, family allowances and exemptions, and enforceable claims, to which is added the sum of the following amounts:

"(1) The value of property transferred to anyone other than a bona fide purchaser by the decedent at any time during marriage, to or for the benefit of any person other than the surviving spouse, to the extent that the decedent did not receive adequate and full consideration in money or money's worth for the transfer, if the transfer is of any of the following types:

"(i) any transfer under which the decedent retained at the time of his death the possession or enjoyment of, or right to income from, the property;

"(ii) any transfer to the extent that the decedent detained [sic] at the time of his death a power, either alone or in conjunction with any other person, to revoke or to consume, invade or dispose of the principal for his own benefit;

"(iii) any transfer whereby property is held at the time of decedent's death by decedent and another with right of survivorship;

"(iv) any transfer made to a donee within two years of death of the decedent to the extent that the aggregate transfers to any one donee in either of the years exceed $3,000.00." Unif. Probate Code § 2–202 (pre–1990), (prior Act. II), 8 U.L.A. 297 (1998).

ed in bad faith or with the intent to deprive Jane of what he deemed to be a fair monetary bequest when he transferred the Prudence Island property to a trust for the benefit of his children.

## Conclusion

For the reasons set forth herein, we affirm the judgment of the Superior Court. The record may be remanded to the Superior Court.

ROBINSON, Justice, dissenting.

I do not lightly dissent from so thoughtful an opinion as the majority has produced in this case. I readily concede that this is a close case, and I recognize that the litigants have each raised quite plausible arguments. Nevertheless, I must respectfully dissent from the holding of the majority.

I agree with the majority that G.L.1956 § 33–25–2(b) appears to have been enacted by the General Assembly in response to this Court's holding in *Pezza v. Pezza,* 690 A.2d 345 (R.I.1997). And I certainly do not question the right of the General Assembly to legislate in this domain as a result of a decision by this Court.

My narrow but significant disagreement with the majority results from my reading of the actual language of the statute, § 33–25–2(b), which the General Assembly enacted after this Court issued its decision in *Pezza.* Section 33–25–2(b), as enacted by P.L.1999, ch. 444, § 1, provides in pertinent part as follows:

"For purposes of this section, *any real estate conveyed* by the decedent prior to

his or her death, with or without monetary consideration, shall not be subject to the life estate granted in subsection (a) if the instrument or instruments evidencing such conveyance were recorded in the records of land evidence in the city or town where the real estate is located prior to the death of the decedent." (Emphasis added.)

I am simply not convinced that the decedent (Horace M. Barrett) actually "conveyed" the subject Prudence Island real estate prior to his death—and the statute clearly requires that there be a *conveyance* for the surviving spouse to be divested of the life estate for which § 33–25–2(a) otherwise provides. I am convinced that the language chosen by the General Assembly ("any real estate conveyed by the decedent") is not broad enough to encompass the instant transfer to a revocable *inter vivos* trust.

The quitclaim deed whereby Horace Barrett purportedly conveyed the Prudence Island property to the cotrustees of the trust *specifically* reserved to Mr. Barrett a life estate with "full power to sell, mortgage, *convey* or otherwise encumber the life estate and the remainder." (Emphasis added.) In my view, such an extensive reservation of powers by the grantor derogates fatally from a conclusion that an actual conveyance occurred by virtue of the quitclaim deed sufficient to meet the express requirement of § 33–25–2(b) that the decedent shall have "conveyed" the piece of real estate that, by virtue of said statute, "shall not be subject to" the life estate provisions of § 33–25–2(a).[9]

9. The following language from the comment on subsection (2) of § 25 cmt. *d.* at 385 of the Restatement (Third) *Trusts* (2003) is consistent with my view:

"[I]n most American jurisdictions the surviving spouse of a married decedent is entitled to a share of the estate of which the

spouse cannot be deprived by the decedent's will in the absence of an election by the spouse to accept something less or different, or nothing, as may be provided by the decedent's will. Although modern versions of these so-called 'forced' or 'elective' share statutes vary considerably in lan-

At the risk of sounding simplistic, my view is that one has not actually "conveyed" if the grantor specifically retains the right to convey to some other person or entity—even though it turns out that the grantor opts not to exercise that retained right to convey in his or her lifetime.

Accordingly, I respectfully dissent.

guage and in details of implementation, a married property owner cannot properly circumvent the policy of such statutes through the use of an inter vivos trust that is revocable, directly or indirectly (such as through an unrestricted power of amend-ment or appointment), by the settlor. This is true even though an outright gift by a married property owner would operate to diminish the eventual elective share of the donor's spouse." (Emphasis omitted.)